**SUNBEAM CORPORATION, Plaintiff and Counterclaim Defendant,**

v.

**EQUITY INDUSTRIES CORPORATION, and Chiap Hua Industries, Inc., Defendants and Counterclaim Plaintiffs.**

Civ. A. No. 85–839–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

May 19, 1986.

David C. Hilliard and Mark Van Buren Partridge, Chicago, Ill., Allan S. Reynolds, Jr., Norfolk, Va., for plaintiff and counterclaim defendant.

Terence Murphy and Stephen E. Noona, Kaufman & Canoles, Norfolk, Va., Edward J. Kondracki and Barry N. Young, Kerkam, Stowell, Kondracki & Clarke, P.C., Arlington, Va., for defendants and counterclaim plaintiffs.

### MEMORANDUM ORDER

CLARKE, District Judge.

Plaintiff Sunbeam Corporation ("Sunbeam"), a well-known distributor of small household appliances, brought this suit against defendants Equity Industries Corporation ("Equity") and Chiap Hua Industries, Ltd. ("Chiap Hua") seeking damages and injunctive relief for unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and under the common law.

Neither side has requested a jury determination of any issue in the complaint.

This matter comes before the Court on plaintiff's motion for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, and defendants' motion for summary judgment. The parties have thoroughly briefed the issues before the Court and on May 7 and 8, 1986 the Court held an extensive hearing on these motions in which the Court heard the testimony of the parties' chief operating officers and various engineering and marketing experts. The Court also has before it a substantial number of depositions, affidavits and declarations as well as documentary evidence supporting the parties' respective positions. Accordingly, these issues are ripe for determination.

### I. BACKGROUND

Sunbeam and Equity both distribute so-called compact food processors. Sunbeam is the distributor of the OSKAR food processor. Since its introduction in December of 1984, more than 630,000 OSKARs have been sold by Sunbeam, generating over $44 million in sales and a great deal of industry acclaim. (Aff. James Connors Par. 11, 12 and related exhibits.) The introduction of the OSKAR, the parties agree, has established a new niche in the food processor market. OSKAR's dimensions, approximately $10\frac{1}{2}$ inches high, $4\frac{1}{2}$ inches wide and $6\frac{1}{4}$ inches deep, permit it to occupy half the counter space of the standard or full-size food processors. Essentially the OSKAR consists of little more than a transparent bowl mounted on a cylindrical plastic casing that encloses a 500 watt motor. The machine is activated by inserting the handle of the bowl into a slot on a tower that rises from the plastic casing at the rear of the OSKAR. The machine's success, spurred by Sunbeam's extensive advertising campaign ($5.4 million spent in advertising in 1985. Aff. James Connors Par. 14), is attributed to the machine's ease in cleaning and operation, its size, and the fact that it costs less than half the price of full-size food processors.

Equity's compact food processor, HERBIE, is similar to OSKAR in its basic size

and shape. First introduced at a trade show in November of 1985, HERBIE did not appear in retail stores until the end of April, 1986.[1] There can be little question that HERBIE's design was influenced by OSKAR's success. Like OSKAR, HERBIE is little more than a transparent bowl mounted on a plastic casing enclosing a 500 watt motor. The two machines appear the most similar when viewed from the front. The front curvature of the smooth, white plastic motor casing on the two machines are identical. Differences, however, are apparent. On both products the trade name and source are shown in distinctive black lettering. In addition, these two compact food processors differ in switching mechanisms, handles and certain bowl features.

The strength of plaintiff's claims is directly at issue under both its motion for a preliminary injunction and defendants' motion for summary judgment. The Court first considers defendants' motion for summary judgment.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted where the evidence presented indicates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as matter of law." F.R.Civ.P. 56(c). Although many trademark and unfair competition cases involve factual issues making them inappropriate for summary judgment, where no significant probative evidence exists in support of a trademark claim, summary judgment is proper. *E.g., Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 116 (2d Cir.1984); *Black & Decker, Inc. v. North American Philips Corp.*, 632 F.Supp. 185, 228 U.S.P.Q. 659, 660 (D.Conn. 1986).

## II. PLAINTIFF'S CLAIM UNDER § 43(a) OF THE LANHAM ACT

■ In order to prevail on the merits of its claim under § 43(a) of the Lanham Act, Sunbeam would have to establish:

(1) that the trade dress or product configuration has obtained secondary meaning;

(2) that the trade dress or product configuration of the two competing products is confusingly similar; and

(3) that the appropriated features of the trade dress or product configuration are primarily non-functional.

*Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1444–45 (Fed.Cir.1984). Accordingly, summary judgment in favor of defendants is appropriate if it can be shown, as a matter of law, that one of these requirements is not met in this case.

### A. *Secondary Meaning*

■ A product's overall appearance is said to have "secondary meaning" when the purchasing public associates the product's appearance with a single producer or source. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982). Secondary meaning can exist where the public links the product or product feature with a "single, though anonymous source." *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 380 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976).

In support of the proposition that OSKAR's appearance had taken on secondary meaning, James Connors, president of Sunbeam Appliance Company, testified as to the product's phenomenal sales success and extensive advertising campaign. Plaintiff also submitted a marketing survey designed to ascertain the extent to which OSKAR's design has achieved secondary meaning.

■ While sales success and advertising outlays are factors to be considered on the secondary meaning issue, they only peripherally relate to public perception of the

---

**1.** A number of compact food processors are to be introduced to the public this fall, including some that also resemble OSKAR. *See* Exhibits 13, 14 and 17 in Support of Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction.

product's appearance. In other words, where a product such as OSKAR creates a new functional niche (*see infra* analysis of functionality issue) and temporarily holds a strong, almost monopolistic position within that niche, public perception may be more closely tied to the concept and function of compact food processors in general rather than to the appearance of the particular trail blazing appliance.

■ Also, the term secondary meaning normally contemplates a product mark or feature that has "been used so *long* and so exclusively" that the mark or feature has come to identify the product. *Union Carbide*, 531 F.2d at 380 (emphasis added) (citing *G & C Merriam Co. v. Saalfield*, 198 F. 369 (6th Cir.1912), *cert. denied*, 243 U.S. 651, 37 S.Ct. 478, 61 L.Ed. 947 (1917)). Here, the OSKAR has been on the market for less than eighteen months. While extraordinary commercial success and extensive advertising can propel a trademark into achieving secondary meaning in a short period of time, *e.g., Selchow & Righter Co. v. Decipher, Inc.*, 598 F.Supp. 1489, 1496 (E.D.Va.1984) ("Trivial Pursuit" trademark), it may take longer for a product's configuration or design to achieve this protected status.

Plaintiff's survey results are also inconclusive as to the existence of secondary meaning. The survey, conducted by a marketing consultant hired by the plaintiff, who qualified as an expert witness, indicated that 58 percent of the 193 respondents questioned associated the overall appearance of OSKAR with only one source. The OSKAR models shown to them had the names Sunbeam and OSKAR covered up. Approximately 52 percent of the respondents who had an opinion said that the masked OSKAR food processor they were shown was put out by Sunbeam, OSKAR or Oster/Osterizer. The expert thereby concluded that OSKAR's appearance had "acquired secondary meaning among a substantial proportion of the relevant consumer population." (Pl.Ex. 47 at 2.)

A second study on this question, this one commissioned by the defendants and performed by an equally qualified expert, showed that less than 10 percent of its 300 respondents associated the OSKAR with one source. Defendant's expert concluded that "no significant degree of secondary meaning exists with respect to the appearance ... of the Sunbeam OSKAR food processor." (Def.Ex. 20 at 14–15.)

■ Faced with these conflicting survey results and armed with common sense and the experts' criticism of each other's studies, the Court concludes that each survey suffers from serious flaws. Criticism of plaintiff's study relates both to the order and clarity of these three substantive questions:

Q4: What company do you think puts out this food processor?

Q5: What is the name of this food processor?

Q6: Do you associate the appearance of this food processor with one company or more than one company?

(Pl.Ex. 47 at 1.) Two problems with plaintiff's survey questions are immediately apparent. First, questions four and five, by suggesting that only one company puts out this food processor, were leading questions. These two questions presume that the food processor was manufactured by one company and no doubt predisposed some respondents towards answering "one company" in their response to the critical question, question six. *See, e.g., Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1268–69 (6th Cir.1985). Survey questions which beg their answers "cannot be a true indicator of the likelihood of consumer confusion," and cannot be relied on to create an issue of fact so as to make summary judgment improper. *Universal City Studios*, 746 F.2d at 118 and n. 8.

The second problem with this portion of the survey relates to the terminology used in question six. In terms of the legal and marketing definition of secondary meaning, question six was properly framed, as it focused on the appearance of the food processor's design rather than on the food processor itself. Question six can easily be

misinterpreted, however, as asking whether the respondent thinks one company or more than one company makes the particular food processor they were viewing. To expect respondents, totally unversed in these tricky marketing and legal distinctions, to distinguish between the appearance of the product and the product itself is indeed asking too much. The natural answer to question six is one company. Thus, it is of little, if any, value to the Court's secondary meaning analysis. *Id.*

Defendants' secondary meaning survey is flawed as well. The two relevant questions in defendant's survey were as follows:

Q1a: Do you have a belief as to what company or companies put out this food processor?

Q1b: What company or companies do you believe put out this food processor?

(Def.Ex. 20 at 10–11.) By failing to focus respondents on the appearance or design configuration of the displayed OSKAR, which is all that plaintiff is claiming has acquired secondary meaning, the survey missed the boat. Also, by asking for the names of companies that produced the displayed product, the survey overlooked those individuals who may have linked the product's overall appearance with a single but anonymous source. *See Union Carbide,* 531 F.2d at 380. Thus, the fact that only 9.2 percent of respondents identified Sunbeam or OSKAR as the source of the masked OSKAR is of little value. *See id.* (secondary meaning found even though less than 1 percent of respondents correctly linked Union Carbide as the source of Eveready batteries.)

Marketing research is hardly an exact science, and the Court naturally expects survey results to be affected by the form and order of the questions used, as well as the calculating method used. However, the great disparity in results, even where the surveys are more or less comparable, leads the Court to the conclusion that neither party has established their respective figures and conclusions. In short, the survey evidence presented by both sides is inconclusive on the issue of whether the shape or design of the OSKAR food processor has attained secondary meaning.

■ In conclusion, while Sunbeam has certainly not established that the OSKAR food processor's appearance has attained secondary meaning, it does appear as though there are sufficient issues of material fact on this issue to preclude summary judgment. Thus, defendants are not entitled to summary judgment on the secondary meaning issue.

### B. *Likelihood of Confusion*

In evaluating the question of whether there is significant likelihood of confusion as to source between the HERBIE and OSKAR food processors, the Court considered the physical appearance and characteristics of the two products and their packaging, the effect of product labeling, and the parties' surveys on the likelihood of confusion issue.

### 1. *Physical Appearance and Characteristics*

■ The issue of whether the two food processors are substantially similar in appearance is primarily factual in nature. Nevertheless, summary judgment is appropriate if the court can satisfy itself that the products are so dissimilar that no question of fact is presented. *Universal City Studios,* 746 F.2d at 116 ("courts retain an important authority to monitor the outer limits of substantial similarity"). In making this evaluation, it is the similarity between the overall appearance of the two products that is determinative, rather than the similarity of particular features. *Id.* at 117; *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 487 (1st Cir.1981).

During the two-day evidentiary hearing, the Court heard a great deal of testimony about the characteristics of these two compact food processors. In addition, the Court handled or examined many of the twenty-nine (including some duplicates) food processors and related appliances that

made our normally austere courtroom resemble an appliance showroom. Thus, the Court, the ultimate trier of fact in this non-jury case, is in as good a position to judge the relative similarity of these two products as it ever will be.

OSKAR and HERBIE do look a lot alike when viewed from the front, and look more alike than the one other compact food processor (the Regale LA MACHINE) currently on the market in the United States. Looking at the evidence presented regarding the HERBIE design process in light most favorable to the plaintiff, OSKAR's design proved to be both the inspiration and a starting point for the design of the HERBIE food processor. *See* Pl.Ex. 22–30. A number of significant changes, however, were incorporated into HERBIE's design in the months that followed. The most visible differences, and thus the most relevant differences in the confusion inquiry, are as follows:

(1) Defendants' food processor is clearly marked with the HERBIE by EQUITY trademark; similarly, plaintiff's is labeled with the OSKAR and SUNBEAM labels.

(2) OSKAR has a plastic vertical tower or column rising from the base at the rear of the product; HERBIE has no such feature.

(3) HERBIE has closed-loop handles extending from the rear of the plastic base and from the bowl. OSKAR has a tiny handle extending from the bowl and none from the base.

(4) HERBIE's switch mechanism is a finger-operated push button located on the top of the bowl handle. OSKAR is operated by rotating the bowl's small plastic handle into a slot on the plastic tower that extends up from the base.

(5) The chopping bowls are different in color (HERBIE's has a blue tint; OSKAR's a brown tint) and their lids differ (HERBIE's lid is basically flat with a bar for use in twisting and removing the lid; OSKAR has a dome-shaped lid).

*Compare* Pl.Ex. 1 (OSKAR) with Def.Ex. 1 (HERBIE). These differences are such that it is totally unlikely that "an appreciable number of ordinarily prudent purchasers [could] be misled, or indeed simply confused, as to the source" of the HERBIE food processor. *See University City Studios,* 746 F.2d at 115. This case is thus easily distinguishable from cases where the allegedly infringing product was "strikingly similar" to its predecessor and essentially copied its logo, *LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 74 (2d Cir.1985), or where the similarities between the respective products and their packaging are "overwhelming." *Selchow,* 598 F.Supp. at 1499.

Indeed, the only parts of these appliances that appear at all similar are the plastic moldings surrounding their motors, and these only appear similar when viewed from the front. Yet, this is right where their respective trademarks are clearly displayed. *See* discussion of labeling *infra.* Thus, the OSKAR and HERBIE food processors convey completely different visual images regardless of the viewer's perspective.

In addition, HERBIE's packaging is very much different from OSKAR's. OSKAR is sold in a 15½ inch high, cream-colored box, while HERBIE comes packaged in an 18½ inch high, glossy black box, which according to the testimony of Equity's president Herbert Cheng, is distinctive within the industry. A further difference in HERBIE's packaging results from Equity's decision to adopt a "self-sell" marketing approach. This approach uses the product's package as the company's primary form of consumer advertising. Accordingly, HERBIE's features are explained on the back of the container with lines connecting each explanation to the particular feature as it appears on a full-size depiction of the unit. When the products and packages are viewed together,[2] any possible confusion

---

**2.** The extent of similarity of trade dress or packaging has been held to be a significant factor in

between the two food processors is eliminated.

Further, the differences between the appearance of OSKAR and HERBIE are more significant than those presented to the court in *Black & Decker*, 632 F.Supp. 185, 228 U.S.P.Q. at 659, the most analogous case of which the Court is aware. There, Black & Decker claimed that Norelco's "Clean Up Machine" portable vacuum cleaner was confusingly similar to Black & Decker's "Dustbuster". The wedge-shaped nozzles of the two vacuum cleaners (the predominant feature of these portable devices) were virtually identical in shape and color. In addition, their packaging was very similar in size, color and in the manner in which the vacuums were displayed. The only noticeable differences between the two portable vacuums were the types of handles, on-off switches and the style of the air vents. Nonetheless, the court granted the defendant summary judgment on the Section 43(a) claim, relying in part on these differences, and in part on the fact that the vacuums were clearly labeled as to source. 632 F.Supp. 185, 228 U.S.P.Q. at 663.

### 2. *Labeling*

To the extent that any source confusion is created by the similarities in appearance between OSKAR and HERBIE, it is more than adequately avoided by the products being clearly and conspicuously labeled. A number of courts have held that a new competitor can copy and produce another's product (absent patent protection) so long as it clearly labels the product as its own. *Litton*, 728 F.2d at 1446; *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 194–95 (1st Cir.1980); *Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 310 (2d Cir.1972); *Black & Decker*, 632 F.Supp. 185, 228 U.S.P.Q. at 663.

In *Bose*, for instance, the defendant essentially copied plaintiff's pentagonal stereo speaker housing. After finding that the defendant's name appeared on the speakers, on the cartons in which the speakers are shipped, and on all promotional materials, the court denied plaintiff's request for relief under § 43(a) of the Lanham Act. 467 F.2d at 309–10. *See also, Litton*, 728 F.2d at 1446 (name displayed in three places in front of microwave oven); *Fisher Stoves*, 626 F.2d at 194 (name and logo "prominently" displayed on the stove door); *Black & Decker*, 632 F.Supp. 185, 228 U.S.P.Q. at 663 (label found both on box and vacuum cleaner).

■ This is not to say that the presence of source labeling is an absolute bar to liability for unfair competition under § 43(a) of the Lanham Act. As the United States Court of Appeals for the Federal Circuit explained:

> The legal effect of labeling a product with its manufacturer's name depends or may depend on both the prominence of the label and the type of product. There may be, and doubtless are, products whose consumer buyers would take little notice of a maker's name or disregard a name plainly evident to the buyer's eye. *Venn v. Goedert*, [319 F.2d 812 (8th Cir. 1963)], *supra*, for example, relates to cookies, a product no doubt many have eaten without noticing the maker's name, if indeed it appeared at all.

*Litton*, 728 F.2d at 1446. The court went on to explain that when goods such as microwave ovens, electric ranges and stereo speakers are prominently labeled as to source there is no legitimate basis for a charge of unfair competition because of the degree of care consumers take in purchasing relatively expensive, long-lasting items. *Id.*

■ While compact food processors are less expensive than stereo speakers or microwave ovens (HERBIE's suggested retail price is $59, *see* Cheng Aff. Par. 12), their

---

the likelihood of confusion analysis. *E.g., Selchow*, 598 F.Supp. at 1497. According to the testimony heard, however, some stores display appliances without their packaging. Thus, because there remains some uncertainty as to whether HERBIE will be displayed with its distinctive packaging, the Court does not rely on the packaging in concluding that consumers will not be confused as to its source.

expected lifespan is relatively long and they are sufficiently expensive to fit within the reasoning of the *Litton* court. Food processors are easily distinguished from products such as medicine capsules and checkbooks that the *Litton* court used as examples of inexpensive, routinely purchased products not subject to the labeling rule. Thus, if properly labeled, consumer confusion should be precluded as a matter of law.

Under this legal framework, there can be no question as to the adequacy of HERBIE's labeling. The two inch by one inch HERBIE by EQUITY trademark appears in solid black letters across the front of the food processor's white base. A green and black hang tag is attached to the handle of each HERBIE before it is packaged, which also identifies the product as HERBIE by EQUITY. The packaging container identifies the product as HERBIE in twelve places and identifies EQUITY as the maker eight times. (Def.Ex. 7.) All of the product's promotional materials make explicit reference to the product as HERBIE by EQUITY.

### 3. Marketing Studies on the Likelihood of Confusion

Finally, the Court turns to the two marketing studies on the likelihood of consumer confusion between OSKAR and HERBIE performed by the parties' respective experts. According to plaintiff's study, a substantial proportion (28 percent) of consumers confused the appearance of the HERBIE food processor with the OSKAR food processor. Defendants' study, on the other hand, concluded that only a minimal percentage of individuals (1.4 percent) confuse the HERBIE food processor with the Sunbeam source. As was the case with the secondary meaning surveys, the Court is placed in the position of having to reconcile seemingly irreconcilable results.

Once again, the Court feels that the structure of plaintiff's study biased the results. Respondents were first shown color photographs of five food processors, including HERBIE but not OSKAR. The four other photographed food processors were all full-size food processors and as such each was shown with its noticeable feeding chute or "chimney" extending out of the mixing bowl (compact food processors are not normally displayed with these chimneys). After a brief interlude, the respondents were then taken to a table on which five food processors were displayed, including OSKAR but not HERBIE. Of the remaining four food processors in the display, three were full-size food processors with their distinctive chimneys and one was the compact Regale LA MACHINE. The respondents were asked, "Which, if any, of these food processors are the same as the food processors pictured in the photographs I showed you?" Twenty-eight percent of these individuals mistakenly selected the OSKAR as one of the food processors whose photo they had seen. (Pl.Ex. 48.)

For a survey to establish the existence of a factual question on the likelihood of confusion it must "have been fairly prepared and its results directed to the relevant issues." *Universal City Studios*, 746 F.2d at 118 (and cases cited therein). That is simply not the case here. Of the five processors shown in the photographs, HERBIE, the only compact food processor and the only one without a distinctive chute, stood out like a bearded man in a lineup with four clean-shaven men. It was natural, then, for a significant percentage of these respondents to confuse the photographed HERBIE with the displayed OSKAR, as OSKAR was one of only two compact processors exhibited in the display, the other being the Regale LA MACHINE which is a different color and shape from OSKAR and HERBIE. When a survey question begs its answer it is not a true indicator of the likelihood of consumer confusion. *Id.*

A second flaw in the survey procedure was that the OSKAR in the display was viewed by the respondents primarily from the front (Lavidge deposition at 201) making it difficult for them to see the rear of the OSKAR where the design differences

between HERBIE and OSKAR are most readily apparent.

■ Finally, plaintiff's survey is flawed in that it focused on product confusion rather than source confusion.[3] Likelihood of confusion as to source is the relevant inquiry under § 43(a). 15 U.S.C. § 1125(a); *see, e.g., Selchow,* 598 F.Supp. at 1496. Plaintiff's survey merely supports what was already apparent—that these two compact food processors look more or less alike—but adds little on the issue of likelihood of source confusion. *See Litton,* 728 F.2d at 1447. In short, plaintiff's survey is so badly flawed that it cannot be relied on by plaintiff to establish a factual question or the likelihood of confusion. *See Universal City Studios,* 746 F.2d at 118.

Defendants' likelihood of confusion survey, on the other hand, was aimed directly at determining whether consumers confuse the HERBIE product with the SUNBEAM source. In that survey, only 1.4 percent of respondents incorrectly identified SUNBEAM or OSKAR as HERBIE's source. The existence of a "few confused consumers does not create a sufficiently disputed issue of fact regarding the likelihood of consumer confusion so as to make summary judgment improper." *Id.* at 118 n. 8.

### 4. *Summary*

■ In summary, the Court finds (1) the overall appearances of the two food processors are not substantially similar; (2) HERBIE's packaging is wholly distinctive; (3) the HERBIE food processor as well as its packaging and promotional materials clearly and prominently identify its name and source; and (4) plaintiff's likelihood of confusion survey to be fatally flawed. Under these circumstances, and particularly

because the Court is in as good a position as it ever will be to gauge the relative similarity of these products, it is reasonable for the Court to conclude as a matter of law that it is totally unlikely that an "appreciable number of ordinarily prudent" consumers would be misled as to the source of defendants' food processor. *Id.* at 115.

### C. *Functionality*

■ Even if OSKAR and HERBIE were sufficiently similar to create a factual issue as to the likelihood of confusion, plaintiff would not necessarily be entitled to proceed to trial on his Lanham Act claim. Mere similarity between products is not actionable under the Lanham Act. *Litton,* 728 F.2d at 1446. After all, the majority of microwave ovens are very similar in appearance and the same can be said for blenders, drip coffee makers, and a number of other products.[4] In order to prevail under § 43(a), the plaintiff also has to show that the appropriated product feature, namely its overall appearance, is "primarily non-functional." *Id.* at 1444–45. It is clear that "functional features which are not the subject of a valid patent or copyright may be imitated with impunity." *Fisher Stoves,* 626 F.2d at 195 (and cases cited therein).

Defendants have clearly established that the individual components of the OSKAR food processor are "functional", even in the narrowest sense of the term. *See* Defendants' Brief in Support of Motion for Summary Judgment at 29–31 and Exhibits 23–25 thereto. Sunbeam contends, however, that the overall design of the OSKAR, its "gumball dispenser configuration", is distinctive, non-functional, and therefore protected under § 43(a). *See Petersen Mfg.*

---

**3.** Q. Right. In the likelihood of confusion survey, why did not you ask the people, who puts out the food processor?
A. Well, after we rethought the whole issue the question seems to me has to do with the likelihood of confusion of the two designs rather than the question of who puts them out. That's the key issue is the likelihood of confusion of the appearance of the product. The products because of their appearance. Not who puts them out.

Lavidge Dep. at 58.

**4.** Indeed, if similarity in appearance were the sole criterion, this or other courts would likely be litigating suits between the makers of the larger food processors, as the similarities between OSKAR and HERBIE are no greater than the similarities among the full-size food processors. (*Compare* Pl.Ex.2d with 2e; and 2F with 2g, 2h, 2k, 2l).

*Co. v. Central Purchasing, Inc.,* 740 F.2d 1541, 1551 (Fed.Cir.1984) (overall product shape protected *if* entire design is arbitrary). In support of its position, plaintiff points to the variety of design configurations used by full-size food processors.

While the existence of comparable products with different appearances is often a good indication that the appearance of the product is not functional, *W.T. Rogers v. Keene,* 778 F.2d 334, 343–44 (7th Cir.1985), the differences in appearance between OSKAR and the larger food processors do not serve the same purpose. OSKAR is not an improved version of these larger food processors. Rather, as reflected both by the testimony and by the articles in trade publications, *see* Pl.Ex. 3–15, it is a product whose marketing success has resulted in the popularization of an entirely new product category—compact or mini-food processors.

■ The standard under which functionality is determined varies between courts, *see* Note, *The Problem of Functional Features: Trade Dress Infringement Under Section 43(a) of the Lanham Act,* 82 Colum.L.Rev. 77 (1982). The Court agrees with those courts that have focused the functionality inquiry on whether characterizing a feature or overall design as functional "will hinder competition or impinge upon the rights of others to compete effectively in the sale of goods." *Sicilia di R. Biebow & Co. v. Cox,* 732 F.2d 417, 428 (5th Cir.1984). Under this standard, a design is functional if it is one of only a limited number of efficient options available to competitors. *Id.* at 429; *see generally In re Morton-Norwich Products, Inc.,* 671 F.2d 1332, 1339–41 (C.C.P.A.1982).

■ Sunbeam does not have a protected interest under § 43(a) in the general concept of a compact food processor. Further, the Court finds that protection of OSKAR's

overall design would unduly hinder competition. Reduced to its basics, the essential components of a compact food processor are a small plastic bowl, cutting blades, a motor and a switching mechanism. Although these components might theoretically be put together in a number of ways, concerns for space, simplicity and ease of cleaning dictate that very few of the other possible configurations could compete with the OSKAR design. OSKAR's basic design configuration—a small plastic bowl mounted directly above a plastic-encased motor—is very simple and space-efficient.[5] To protect the simplest, most efficient known design for compact food processors would unduly hinder competition. *United States Golf Ass'n v. St. Andrews Systems,* 749 F.2d 1028, 1034 (3d Cir.1984) (summary judgment on functionality upheld where "best design" was involved); *see Biebow,* 732 F.2d at 428; *In re Penthouse International Ltd.,* 565 F.2d 679, 682 (C.C.P.A.1977).

■ Having held the overall design to be functional, the Court must reject any attempt by Sunbeam to break that design into its various components. Where the overall design is functional, the presence of "some arbitrary features" does not defeat the defense of functionality. *Petersen,* 740 F.2d at 1550. Thus, it is irrelevant that the shape of the plastic motor casing may be based on ornamental as well as functional considerations. Even so, it is noteworthy that the evidence established that the motor must be surrounded by a casing large enough to allow free passage of a sufficient volume of cooling air and yet the casing must be as small as possible to save shelf space and to be easy to handle. These two basic functional requirements dictate a large degree of similarity in compact food processors.

---

**5.** As consumer and trade articles discussing the OSKAR clearly point out, OSKAR's diminutive design was a dramatic step forward within the food processor field. One such article stated: "Sunbeam has succeeded in making diminutive the design of the standard food processor without whittling much off the basic functions.

Standing about 11 inches tall and only taking up a 4-by-6 inch space on the counter, the OSKAR is perfect for the kitchen with limited room." (Pl.Ex. 11). Another quoted a Hamilton Beach official as saying, "The Oskar may create a new generation of food processor in the near future." (Pl.Ex. 3).

In short, Sunbeam seeks to protect what was at the time the simplest, most space-efficient design for a compact food processor. Almost by definition, such an improved design becomes an "essential" part of the product and "affects the cost or quality of the product." *Inwood Laboratories*, 456 U.S. at 850 n. 10, 102 S.Ct. at 2187 n. 10 (test for functionality). The functionality defense was developed to protect such advances in functional design from being monopolized:

> Development in a useful art is ordinarily toward effectiveness of operation and simplicity of form. Carriages, bicycles, automobiles and many other things from diversity have approached uniformity through the utilitarian impulse. If one manufacturer should make an advance in effectiveness of operation, or in simplicity of form, or in utility of color; and if that advance did not entitle him to a monopoly by means of a machine or a process or a product or a design patent; and if by means of unfair trade suits he could shut out other manufacturers who plainly intended to share in the benefits of the unpatented utilities and in the trade that had been built up thereon, but who used on their products conspicuous nameplates containing unmistakably distinct trade-names, trade-marks, and names and addresses of makers, and in relation to whose products no instance of deception had occurred—he would be given gratuitously a monopoly more effective than that of the unobtainable patent in the ratio of eternity to 17 years.

*Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 331 (2d Cir.1983) (quoting *Pope Automatic Merchandising Co. v. McCrum-Howell Co.*, 191 F. 979, 982 (7th Cir.1911)). Had Sunbeam's design for the plastic base been more colorful or included ruffles, ridges or other flourishes (*i.e.*, if the design was to any extent ornamental or arbitrary), the Court may have reached a different conclusion. As it is, the Court cannot help but conclude that OSKAR's overall appearance and design is functional and thus not protected under § 43(a) of the Lanham Act.

## III. PLAINTIFF'S STATE LAW CLAIMS

The Court now turns to the question of whether plaintiff's state law claims for: (1) unfair competition; (2) violation of the Uniform Deceptive Trade Practices Act; and (3) violation of the Virginia Consumer Protection Act are preempted by federal law under the doctrine established by the United States Supreme Court in *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

In *Sears* and *Compco*, the Supreme Court refused to enjoin competitors from copying certain product features even though the trial court had concluded that these features had achieved secondary meaning and that there was a likelihood of confusion. *Compco*, 376 U.S. at 238, 84 S.Ct. at 782; *Sears*, 376 U.S. at 232–33, 84 S.Ct. at 789–90. The Court held that "because of the federal patent laws a State may not, when the article is unpatented and uncopyrighted, prohibit the copying of the article itself or award damages for such copying." *Sears*, 376 U.S. at 232–33, 84 S.Ct. at 789; *Compco*, 376 U.S. at 238, 84 S.Ct. at 782. Under these decisions the states retained only the rights to regulate product labeling and to impose liability on those who attempt to palm off their goods as goods of another. *Id.*

Initially *Sears* and *Compco* were construed as eliminating any common-law trademark and state-law unfair competition protection for product features. More recent decisions, however, have adopted less expansive interpretations of these decisions. *Truck Equipment Services Co. v. Fruehauf Corp.*, 536 F.2d 1210 (8th Cir), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976) ("TESCO"); *see also Litton*, 728 F.2d at 1448.

While the outer contours of the preemption coverage of Sears-Compco are uncertain, there can be no disagreement as

to its applicability to the case at hand. Where the product design or feature at issue is primarily functional, it is not subject to any form of trademark protection.[6] *In re Honeywell, Inc.,* 497 F.2d 1344, 1347–48 (C.C.P.A.1967), *cert. denied,* 419 U.S. 1080, 95 S.Ct. 669, 42 L.Ed.2d 674 (1974); *In re World's Finest Chocolate, Inc.,* 474 F.2d 1012, 1014 (C.C.P.A.1973); *see Litton,* 728 F.2d at 1447–49. Useful, *i.e.,* functional, product features are important enough to competition to require their eventual accessibility for public use. Patent protection encourages the development of useful product features and gives the inventor a 14–17 year monopoly in reward for his efforts. However, the patent system recognizes the fact that eventually useful features must be made available to the public.

 It is true, as plaintiff contends, that state regulation of the copying of ornamental or non-functional features is permissible. *Litton,* 728 F.2d at 1447–79; *see TESCO,* 536 F.2d at 1214–15 (Sears-Compco not applied where design was non-functional). In this context, the state's interest in preventing consumer confusion as to source by assisting consumers in distinguishing between goods of different producers does not conflict with the patent interest in making sure that useful product features be made available to the public and be freely copied by competitors. *In re Honeywell,* 497 F.2d at 1348. Here, however, the Court has held that the overall appearance of the OSKAR food processor is primarily functional.

### IV. CONCLUSION

The Court GRANTS defendants' motion for summary judgment on plaintiff's Lanham Act claim because there is no significant likelihood of consumer confusion and because OSKAR's overall design and appearance are primarily functional. Defendants are also GRANTED summary judgment on plaintiff's state law claims as they

---

**6.** Plaintiff has not brought any case to the Court's attention, nor is the Court aware of any case, that upholds a state unfair competition

are preempted under the Sears-Compco doctrine.

### V. PRELIMINARY INJUNCTION

Having granted defendants' motion for summary judgment with respect to plaintiff's state and federal claims, plaintiff's request for a preliminary injunction is now moot.

The Clerk is directed to forward a copy of this Memorandum Order to all parties.

IT IS SO ORDERED.

claim involving a functional product feature or design.